All right, the next case on the docket is Keck v. Keck, and it's clause number 5-12-0503. And Mr. Oswald, when you're ready, you may proceed, sir. Please report, Your Honor. Audience, my name is Ronald E. Oswald, and I represent Keck Land Company and Kent Emory in this appeal. I want to point out and emphasize that I do not in any manner represent John Keck, although in my brief and in my comments today, there is some common interest between John Keck and Kent Emory and Keck Land Company that I will comment on some of the judge's findings in regards to John Keck. But again, I do not represent John Keck. I represent Keck Land Company and Kent Emory. This appeal is the latest judicial action involving Keck family members, several other entities, including Keck Land Company LLC, and later in litigation, Kent Emory, that commenced in the 1980s with Fred and Vanessa's divorce proceedings in Fayette County. The underlying issues of these actions are not an issue of this court, but they're important to understand very briefly. One of the important claims is Vanessa's claims that Fred transferred property to a corporation in the area of freight forwarding in violation of their divorce decree, and she also filed to set aside to do the Uniform Fraud and Transfer Act, and that's case number 10-CH-44. Fred also filed suit in case number 10-CH-08 against John Keck, Kent Emory, and Keck Land Company, claiming a constructive trust on certain real estate. He claims was needed to Keck Land Company with an agreement to re-transfer the property to him when he was financially able. Fred is not sure of the terms of this alleged agreement and no writings exist. Now, Keck Land Company LLC is an Illinois LLC that prior to the sale we're going to talk about that occurred on May 24, 2012, owned approximately 2,100 acres that was purchased from Guaranteed Freight Incorporated, which was Fred Keck's company. Now, Keck Land Company is owned 45% by a company called Waterfowler Express Incorporated that is 100% owned by John Keck. The other 55% of the LLC, Keck Land Company, is owned by Kent Emory. At the time of the sale and the time of the negotiations we're going to talk about, John Keck was the manager of the LLC. Now, Keck Land Company normally owns the 2,100 acres and it leases it out to third parties, usually on a cash rent basis. Now, the precipitating event for Fred Keck filing 12-CH-44 was that Keck Land Company had planned and advertised a complete dispersal sale of all 2,100 acres it owned for March 17, 2012. And as a result of that sale, Fred filed his action claiming the constructive trust and in essence delaying the sale from going forward. At the same time, Vanessa Keck also came into the action and began to try to stop the sale. Now, in addition to these two lawsuits, other disagreements between the parties have arisen over the years. And this all came to accumulation whenever the land was trying to be sold. In order to allow the sale to go forward and settle all the claims between all the parties, a settlement agreement was reached. And that is the issue that we have in front of us today in terms of that settlement agreement. Just to make sure I understand, Fred and Vanessa Keck were formerly married and divorced. Correct. John Keck's son? Fred Keck's son, not Vanessa. Fred Keck's son, but not Vanessa. Okay. And what about his daughter? There's two daughters that are also Fred Keck's. Okay, so Vanessa is not the mother of any of the two daughters? That I'm not sure of. It may be the daughter, but no, she's not his daughter. Okay. Now, in the settlement agreement, which is A524-526 in the record, keep in mind this settlement agreement was negotiated as a result of two pending litigations. Every one was represented by counsel. We have a sale pending. It can't go forward until the settlement agreement is over. So there's no one person that prepared this. I don't know who the scrivener was, but I know all the attorneys, everybody was represented by counsel. And if you look, you've got all these lawyers, how does anything in me just get in here? There isn't anything, right? There is because I have a good, because of all these lawyers. But if you see in paragraph seven, we take care of the divorce. We're the friend minister. In paragraph five, we take care of 10CH10. In paragraph eight, we take care of 12CH08. In paragraph six, we take care of a potential subrogation claim that Keck Land Company might have against Fred Keck for payment of $975,000. Paragraph eight, we take care of a hunting lease dispute. Paragraph seven and nine, we take care of close to H44. So this is not merely a one lawsuit. This is a combination, and that is the agreement. And the agreement was negotiated, people were represented. Now, the paragraph that we're concerned with is paragraph 12. I'm going to take the time to read it. It says, if for any reason the scheduled sale of the property referred to in paragraph one does not take place, or if the purchasers of that sale fail or refuse to close purchases with an HESC, then Keck Land Company, John Keck, Timothy Emrick, and Water Power Express shall have no obligation to pay the $925,000 or any other amount to Vanessa Keck. Further, in such an event, all obligations and undertakings by all parties to this agreement shall be terminated and be held null and void. All releases shall be lowered in case number 12-CHA and case number 10-CH44, shall be reinstated without prejudice, and all parties shall be restored to the status quo as it was at the conclusion of the hearing in case number 12-CHOA on March 13, 2012. Your opponent says you misquote that. What's your response to that? What they say is that I say that it's all, and that's exactly right. That's not misquoting it. Purchases is all. And nowhere in the record do I ever say all. I hope this is exactly correct. They twist it to say that I'm saying it's all, but I am on record, and I will tell you it's in the read. Our position is that that means all. Purchases with an S means all. And that means that if one parcel being closed, then this is an adult. And there was no prohibition for them to participate in the site? There was. Up in paragraph 2, let's see. No, I'm sorry. In the agreement, yes, there is a prohibition against the Keck family from interfering with the sale. Interfering, but not bidding. But not bidding. There's no prohibition there, okay? It's from interfering with the sale, and that wouldn't cause a breach of paragraph 12. That just means that the company would have damages against them if they did. So that's kind of a non-issue and a red herring in my mind. Your argument is that if any purchaser fails to close, paragraph 12 is involved. That's correct, Your Honor. Well, how can you put – didn't you avoid all the other sales? No. How do you put everybody back in the status quo? Well, the sales that went through, Your Honor, went through and were paid off, and we're going to get to the judge's order. Well, but then, you know, see, at that point, then Keck Land Company's got all the mortgage paid off, and, I mean, they're not a status quo, right? But there's nothing that says – Your Honor, the agreement doesn't say a status quo. Let's keep in mind – No, it says that all parties shall be restored to the status quo as it was at the conclusion of the hearing in case number 12-C-H-O-A. That's correct. But, I mean, that's really impossible at this point. I mean, if only one person would have bought it all and not closed, then we wouldn't be here, I guess. Your Honor, Your Honor, the agreement was negotiated by all the parties with attorneys. It's not ambiguous in any manner. It's case law. We've cited all the case law. There's no ambiguity here. Everybody's agreed there's no ambiguity. It's on the record. So the only issue is, you know, there's no ambiguity at all. If there were an ambiguity, if you will scour the record, there's absolutely nothing for you to base a decision on because there's no testimony about whether at the time this was entered into, what was the intent of the parties. There's no testimony that says that, you know, any or all – not any testimony. So there's nothing for the court to reform. As you all know, you can write an agreement as long as it's clear, if it has an observant result, lots of cases. That may or may not be what all of the attorneys were thinking at the time. So there's not any ambiguity in this paragraph here. And if you look at 8198, 8204, which is one month after the sale, one month after the sale, Judge Charlie entered and ordered dismissing Vanessa Keck's claims with prejudice and says, Minus complaint against all defendants, this case is hereby dismissed with prejudice as to the real property described in Exhibit A and Attachment 2 and made a part here of subject to reinstatement if any transaction resulting from the land auction described in the settlement agreement entered into between the parties should fail to close. That's a month later. He says anything. Right. Says anything. So if any of them don't close, then the lawsuit's reinstated. Any such reinstatement shall only be as to the tract or tracts subject to the contract or contracts which fail to close. So this bootstraps right in with the agreement that says if it doesn't close, then we close the transactions we have. We go back to where we are. Where's that in the record? That's 8198, 8204. Your Honor, I'd like to ask for five minutes for rebuttal. Can I do that now? You do get five minutes for rebuttal. Okay.  Let me see where I am. Okay. So this, as I indicated, this was not a simple negotiation. Now, the final document that I want to talk to as much as my time allows me is the judge's order. And the judge's order is 8514 to 560. Now, as I indicated earlier, I want to briefly get on a few things in regards to John Keck's testimony. But, again, I don't represent him. If you look at the judge's order, one of the things that's interesting is that there's four contracts that are entered into by the Keck family, Vanessa and John and Fred, and they did what they did at that time. Now, one of the big complaints that they have and the judge has is that, quote, the 10 percent deposit was waived. But yet that 10 percent deposit being waived allowed John Keck to bid on behalf of his family, but that point was benefited, and they weren't complaining about it at that time. But now that they come back and complain that somehow there was 10 percent, we'll spend a little time on that. The judge, I think, misconstrues the evidence. I believe the evidence shows that John Keck tried to get financing. He may have been naive, but he believed he had what I call interim financing, gap financing of $400,000 from a family friend, that he was then going to use to go to the local banks to finance the entire amount. He went to two banks, two financial institutions. He filled out papers. They told him there was no reason. They weren't going to finance it. So while the judge really hammers John about that, at the same time, he exonerates the family that was involved in it with the four agreements. And there's an inconsistency in the judge's orders. He finds that no one in the Keck family interfered with the sale, yet down below he finds that John Keck, who was certainly a member of the Keck family, interfered with the sale and caused it not to close. So there's an inconsistency there. Now, is there any evidence or dispute that he really could have gotten financing but just chose not to? Oh, absolutely not. There's no evidence in the record of that at all. And nobody tried to introduce that evidence. The evidence, the sole evidence is that he went to the banks, that there was, and the family members testified that there was a man who was supposed to provide $400,000, and they backed out. And Mrs. Keck testified that she was going to provide $500,000 but not until the $400,000 came in. So he was trying to put together a complicated financial situation. Keep in mind, my clients didn't know it. He was doing this all on his own, and the court finds he was acting on his own. So one of the things that whenever we get down to paragraph 6, the last sentence of the book says, it is of little consequence that John was not acting as an agent of KOC. Well, I'll make the difference. It's a big consequence because John, all the testimony was, during this time, by everybody, all four of the decks on the stand, everybody, that John was acting on behalf of himself. There's questions to whether he was acting on behalf of the family. As I say, that's a red herring. He was always acting on behalf of himself, never KLC or Tim Emmerich. Now, the nut of this, from my client's perspective, is the court's ruling and finding that the cause of this not closing was, quote, Tim Emmerich's waiver of the 10% bail requirement and his failure. Although Tim did not take part in John's failed purchase attempt, he allowed it to occur and could easily have been prevented. No evidence of that anywhere. Made up out of whole cloth. Anything in the agreement that would not allow the waiver of the 10%? No, absolutely not. The agreement does not mention the 10%. The 10% was decided by Keck Land Company in consultations with Todd Irwin, their broker, months before the lawsuit was filed. It's a normal provision in a contract. So that was decided on as a business decision when John Keck was the manager. Not Tim, John Keck. As you go forward in time, then when they were getting ready to go to the sale, the Todd Irwin's testimony is he went to Tim and said, Let's let John use his equity, not pay the 10%, use his equity for the down payment. It'll help the bidding. It's all on the record. Tim didn't initially want to do it. Tim has no way of blocking it. He's not the manager. So he reluctantly agrees to let them bid, but he doesn't know anything about it. Now, the court turns that around and says that somehow or another, Tim, who is a 55% ordering LLC, not the manager, somehow or another, he's responsible for the 10% waiver, which is a 100% business decision that was the court's narrow agreement. It was in the sale proceed months before the lawsuit was filed. That was Keck Land Company business decision. The record is complete with saying that Tim is reluctant to do it. Their professional advisement will help the LLC, and he allows it. Keep in mind, a deposit just means that if you don't show up with your money, the LLC gets that deposit. The LLC has a claim against John Keck for his $400,000 against his equity. That claims a lot. And eight other people were allowed to waive that. It was business decisions. Then after that, the judge criticizes Tim because he says that he then had a meeting. He became the manager, as John Keck voted for, because you've got a situation here with a guy that owes the money.  So he's changed as the manager, and they hire me to represent Keck Land Company. Now, they criticize because he doesn't do an action, and we don't spend the money to do an action for specific performance. Now, gee, believe Christmas. If a man doesn't have any money to fold for the first time, how could he have any money for specific performance? Then the judge says that Tim knew that John didn't have any money. He had limited resources. It's not true. The only thing in the record anywhere about John's resources is after he couldn't close, they had a meeting, and John told him he couldn't close. Tim had no knowledge of his financial condition, if you will, to say. It made up our whole cost somehow or another. So what's happened is that my client is getting painted with what they believe are bad actions on behalf of John Keck, and whenever you look at it, read the record, look for the facts, you will find that none of what the court has indicated in paragraph 8 and 9 is based upon any facts. Thank you. Do you have an opportunity for rebuttal, Mr. Osmond? Okay. Thank you, Your Honor. Please support counsel Mr. Osmond. My name is Dave McDevitt with McDevitt Hosting Hornikeen Daters in Effingham. I've represented Vanessa Keck since 2004 with my former firm in Effingham, and I've continued that representation since. The recitation of the facts by Mr. Osmond was close to complete and accurate, but I want to clear up a couple of things. The prior litigation, the real estate that's at issue here, we have been chasing since 2004. Fred and Vanessa were married. The real estate was originally owned by Fred individually. He transferred it into his corporation, Guaranteed Air Freight. We refer to it as GAF. We made an issue of that in the trial court in the dissolution of marriage proceeding, first of all, but GAF was determined to be Fred's non-marital property, so he was awarded that property. After Judge Roberts made the decision in the dissolution case, it was appealed, and we were before this honorable court then, and the court reversed Judge Roberts and remanded the case back. In the interim and before the court made a decision, Fred transferred this real estate from his non-marital corporation, Guaranteed Air Freight, to the defendant's hearing. We then filed a fraudulent transfer action prior to a decision even being rendered by Your Honors in the dissolution of marriage proceeding. So by the time it's remanded, the real estate that was at issue, which is now fair game in the dissolution proceeding, is now owned by Tech Land Company and no longer by all the parties to the dissolution. So we filed a fraudulent transfer action and proceeded. Ultimately then, upon remand, the dissolution of marriage proceeding was resolved by settlement agreement also, and in that case, Fred was awarded all the real estate that he owned, and a judgment of $974,000 was entered in favor of Vanessa and against Fred. The question then was where are we going to collect that from? Well, we were going to proceed with the fraudulent transfer case because that's where all the assets were now. And the transfer was made. It was about $7.4 million for real estate, according to the evidence in the dissolution case. It was transferred to Tech Land Company for some $4.2 million. So that was the basis of the fraudulent transfer. Now, when we started the fraudulent transfer case, what counsel did not mention is there was a preliminary injunction entered by agreement that prohibited the further encumbrance of the real estate and the sale of the real estate. And before we knew it, an auction was actually scheduled in contravention of that preliminary injunction. That became the basis for all this litigation. We wanted to stop the sale because there was a preliminary injunction in place that prohibited it. The defendants, nevertheless, scheduled the auction. And you negotiated that to allow the sale to proceed? Ultimately, we did. Right. Yes, when we came back, counsel was correct. Fred then filed his constructive trust action trying to undo his own transfer to Tech Land Company. We're all together and we reached this agreement. And the agreement said that they couldn't interfere? Correct. So how is bidding interfering? Bidding, when he was aware that he was unable to close the transaction, we believe to be interference. Now, it's also not necessarily our opinion that he was prohibited by the agreement from interfering. I mean, Your Honor is correct. There was no prohibition against any of the parties bidding, and that's exactly what happened. And frankly, I don't know that we would have objected to him bidding had he had the ability to close because the position of the plaintiff and what the findings of Judge Lowley were, not that he bid, the act of bidding in itself wasn't an interference. It was his failure to close it. Bidding when he knew he couldn't close it, and then ultimately failing to close it. That was the interference. And I do think that the interference argument in counsel's appeal here is a little bit of a red herring because there is no question that Vanessa did not interfere with the sale. I'll touch upon these land agreements. It is absolutely true that John had the idea, according to the testimony during this hearing, it was John's idea to engage the family members in these discussions in a way to end up with the Keck land coming back to the Keck family. So they entered into these land agreements. But what they showed, and John admitted, is he had to close first. Nobody was contributing anything towards the purchase of this prior to closing. He had to close, and the land agreements themselves say after the closing, then he will claim the real estate to the firm. So that didn't end up being interference at all, and nor did he expect there to be any contribution from the other family members. The only interference, if you will, from Vanessa Keck that John testified to during the hearing was she would not agree to release the memorandum of judgment against Fred because what Fred wanted to do was to sell us another real estate that he had, but our memorandum of judgment from the disillusioned marriage case prevented him from doing it. It was a plow on that title. So that's what he asked to do, and he said, no, we're not going to release the memorandum of judgment when we haven't had the judgment satisfied. That's the evidence, so it was the only interference. I do want to go back because I think it's important with regards to who these parties are. Vanessa and Fred had two children during the marriage, Lauren Keck and Gary Keck. John is a child of Fred from before this marriage, so he's not a child of Vanessa's. Declared one of the things, John Lackey was the scrivener of this settlement agreement, and he represented at the time I believe all of the defendants at the time. So we agreed that we entered into this agreement trying to resolve everything, all of the lawsuits, the constructive trust case, the fraudulent transfer case, the disillusioned marriage case, everything would have been resolved, but for the actions of John Keck and Tim Emmerich. That's our position, and that's the finding of Judge Loyalty. The first argument that they make is that there was a condition precedent that failed, i.e. that the sale failed. It is our position that no, in fact, the sale did occur. There was a sale. Nine tracks were bid on by John, and he failed to close on those 1,073 acres, but the rest of it sold. So there was a sale. The question is what happens when the agreement doesn't address this particular case where some of them close and some of them don't. I agree that there is nothing in the agreement that addresses this unfortunate result, but I think what the court looked at, and I think this court should look at first, is why did that condition precedent fail if that's your determination? And it's because of the lack of reasonable efforts and the wrongful act and the wrongful prevention doctrine of Tim Emmerich and John Keck. John, by bidding when we believe the evidence shows that he didn't have the ability to close it, first of all, and then since he took action. What is the evidence of that? What is the evidence that he didn't have the ability prior to the sale and his bidding? The testimony was, the argument was first, that he relied upon those land agreements, the other agreements with the Keck family conspiracy. But what the evidence showed was that he understood that he was not going to get a contribution from Fred Keck or Gareth Keck or Lauren Keck or Vanessa Keck until after he closed. He ultimately admits in his testimony, I knew I had to close before I had to convey anything to the other members. So that wasn't part of it. There were discussions going on with a man by the name of Potter, who was a family friend who was apparently discussing with him the possibility of a bridge loan. John Keck ultimately admits that before the gallows comes down, he either knows that Potter is not going to contribute anything or he doesn't know. He doesn't know if Potter will or not. He certainly wasn't given the assurance that he was going to. Now, Doug Knabel, who was representative of one of the potential lenders, was also there. He was in the room when John was doing the bid. And apparently there were discussions by John afterwards with Doug Knabel and Middle States Bank and one other lender about the possibility of borrowing the money. But no formal applications were ever submitted. There were no attempts to borrow less than the full $4.2 million. There were no other lenders that were contacted. So everybody here, all of the parties, had a duty of good faith and fair deal. It's not justóthe Fed focuses on John's actions and his failure to close. That's one part of it. But remember, John was an individual. He was both the buyer and the seller. He wasóTim Emmerich was assigned to the agreement as an individual, was a party as an individual under that same duty, and as an owner of the seller under the same duty. So it's not just John's failure. It's also Keck Land Company's efforts to comply with the agreement. There were other bidders on the same property that John bid on. There were. He just outbid them. He outbid them. And what the testimony revealed is that the auctioneer, Todd Hewing, is communicating with John Keck throughout the auction. He's running back and forth. He's even advising him on what to bid. He's telling him, ah, this person's going to bid that, this person's going to bid this. I think if you get to this number, then you'll be a successful bidder. So he's also involved in these biddings. He wants to bid that, right? Absolutely. And he's never been paid. He gets a percentage, I assume. Yeah. The higher the minutes, the higher his 2% commission. So he has an interest in it as well. Nothing illegal about that? Nothing in their contract that prohibited that? I don't know if there is, and there isn't. Whether there's a civil action that could be conjured up there, perhaps. We have not pursued that. Primarily because Mr. Hewing hasn't really pursued his commission. He understands this has to be resolved before that occurs. So when you look at not only John Keck's reasonable efforts, but Keck Land Company's reasonable efforts, I agree the settlement agreement itself did not contain all of the terms of the sale. It said you have to sell it at auction. So they complied with the customary order of business. Mr. Hewing sets up these contracts. They require the 10% down. It is apparently true that other bidders have discussed the potential of waiving this 10% escrow requirement, but the fact is that all of the other successful bidders put 10% down. So of the successful bidders who signed purchase contracts, only John Keck was allowed to waive that 10% escrow. And there's nothing that would prohibit the waiver? No. No, I don't think there is. But what it does show is what efforts were made to comply with the settlement. Because what makes some sense to me, and I think to everyone, is if you are both the buyer and the seller, then you can negotiate with yourself. I get that. I also agree that it was possible to utilize John Keck's equity in Keck Land Company to sell her, to close the sale, ultimately. He would have to borrow less if they agreed between themselves how to utilize that equity. That makes some sense. It could be worked out. But what the testimony is, is they never even discussed it. There's a basis for that determination. I will waive it because we're going to use your equity to allow this to close. But the testimony then is did you ever talk about it after that? No. Did you ever discuss the reason why you waived the 10% and use that equity? No. The only action that Keck Land Company took to enforce it was Tim talking to John, John saying it doesn't look good. That's the testimony. Are you going to be able to close? He says it doesn't look good. But the purchase contracts that were signed had seller's remedies in it, none of which were tried. The only action taken by Keck Land Company was to send a letter from Mr. Osmond, and in that letter it declares the contracts terminated. It says you're in default, contracts are terminated. And by the way, the nonexistent 10% equity that wasn't used now is a claim for Keck Land Company. Tim Embert owns 55% of Keck Land Company, so whatever benefits Keck Land Company benefits Tim Embert the most. That's the only action they took. Whether or not John would have had the ability to comply with a specific performance order, we'll never know because nobody enforced it. Nobody filed anything. No damages were sought. Those were all remedies that were available, and I would suggest that reasonable efforts to comply with the settlement agreement means taking all steps available to you to enforce the agreement that was reached. You comply with the purchase contract, that fulfills your duty for reasonable efforts to comply with the settlement agreement. That simply was not done. And the excuse was entertaining, and his excuse was he didn't have time. I didn't have time to do that. He did have time to do a lot of other things, including encumbering the property further. The record shows here that we had a long hearing on my petition for contempt that was filed because our position was the preliminary injunction was in place. It prohibited the further encumbrance of the real estate pending the outcome of the litigation, and unbeknownst to us, he went out and got another mortgage. So he continued to benefit from it. They continued to earn the rent from the land. He was able to refinance all of his other obligations. Our position was all in contravention and in contempt of the preliminary injunction, and the court found that he was in contempt because of one docket entry, and that docket entry was indicative of Vanessa's good faith here. When all of the other bidders were seeking to close, certain steps had to be taken to allow them to close, including the motion to dismiss that counsel referred to. It's a partial motion to dismiss, and it's only as to those tracts of property that were going to close. So she filed that to allow those to close so there wasn't anything in the record that prevented it and remained to file the title for these bona fide purchasers. She also agreed to a partial release of the Liz pendants. Of course, we had reported the Liz pendants. Partial release of the Liz pendants to allow all the others to close, and what she wouldn't do is release a memorandum of judgment because she wasn't paying that. But that's indicative of all the steps she took to not only not interfere but to accommodate the sale and would have done so had John sought to close this transaction. So, again, looking at all of the parties, not just John Keck and his failure to use reasonable efforts, but also John Keck as the seller. He's the manager of Techland Company. It's his obligation to use reasonable efforts, so it's his obligation on behalf of Techland Company to enforce the purchase contract against himself as an individual. I know it's unusual, but that's what occurred. So coming full circle here to I agree that there is no provision in the settlement agreement to address this particular circumstance. Some of the purchasers closed, some don't. One of the two paragraphs could be triggered. Paragraph 12, which counsel would prefer, says everybody's restored to the status quo, which happens to be totally impossible. Or paragraph 2, which says if the sale takes place, and it did, and the proceeds aren't enough to pay Vanessa, then the defendants have the obligation to pay Vanessa the 925. One of the two is triggered either way. So I hate to be flippant about it, but we choose paragraph 2. In any event, I don't think that the court really even needs to get to that, because the settlement agreement would have been completed had the other defendants, Kim Emmerich and John Keck, utilized their reasonable efforts. If they had been in good faith, they would have, whatever it is, either not bid no and they couldn't do it, or sought to enforce the purchase contracts, sought to get financing from somewhere to do it, utilized the equity to get a tech-land company, borrowed less than what was necessary to close every transaction to get Vanessa paid. That was an option that was never pursued. There were many things they could have done, and they did none of them. So one final word, Your Honor, with respect to the other argument, if you get to it, if you find that there were, in fact, reasonable efforts, the reformation argument. A reformation action changes the contract to reflect the intent of the parties. That's what a reformation action is. I would suggest, Your Honor, that ordering the sale of the real estate, when the settlement agreement required the sale of the real estate, is not a reformation. It doesn't change anything. It simply reflects what the party's original intent was, which was auction the property, sell the property, pay Vanessa, dismiss the lawsuits, period. Everybody lost that. It's not a reformation at all. Thank you, Your Honor. Thank you. Mr. Rossman, your mother? Yes, Your Honor. Quick question before you begin. You can guess how long it is. Oh, five minutes. Okay. I'm sorry, I didn't hear you. What was the smallest tract and smallest amount of money involved in the auction? I remember the 98th tract, Your Honor, and most of it went in the 3,000, 4,000 acre, but I can't tell you the exact tract. So in any event, your position as to the interpretation of paragraph 12, though, is that if that smallest sale had not gone through, had not closed, then 12 comes into effect. Any one purchase. That's correct, because the contract is unambiguous. It says purchase. And so even if there was plenty of money there to pay Vanessa and pay everything else, and just this one small tract, you would say everybody goes back to square one? That was the agreement, Your Honor. It could be easier if it said all purchasers instead of just purchasers. But it's the same. All purchasers. Yes. It's not any ambiguity at all. Well, let me just ask this. I mean, wouldn't the intent of that provision be, you know, what do we do if we don't have a sale and there's no money to divide? Well, do we all go back to where we were? That is an excellent point, Your Honor, because he just finished with saying what the intent of the party was. There's not one scintilla of evidence in your record for you to decide what the intent of the parties was. There is no testimony that says we intended to sell it all or we only intended to sell one. So this court can only act upon the record. And one of the cases that counsel cited, which is the Battle v. Mascolero case that says, if the plaintiff correctly argues that a contract court should be a concrete expression or should not add terms which are decided, however a written contract may not, must not provide for every feasible contingency, then it goes on to talk about that if there is something in the record that indicates that there was an essential element left out and both parties agree that it was left out, then the court can add it. But this court cannot now, just because counsel, there's nothing in the record about the intent of the parties on the contract, nothing about that at all. So you have nothing to act upon. You cannot do, you can't insert a contract because counsel argued paragraph 2, I've argued paragraph 12. There is no factual basis in this record for you either to find that it's not ambiguous, I mean that it is ambiguous, and if it is ambiguous, there's nothing in the record to guide you as to what the intent of the party was, which is what's required in the statute, in my case. So as unfortunate as it sounds, unfortunate as it sounds, this is the bargain they struck. Now, I didn't hear anything that counsel said about Kim Emmerich. All I heard about was John and John and John and John. And what they want to do here, Your Honor, is they want to step into the shoes of the businessman from John and Kim and say just because they didn't do what they think they would have done, and quite frankly, some of the things that they've offered from a commercial standpoint are ludicrous. You'd be wasting your time to go out and do these kind of things. So, you know, they're saying we did this, we did this, we did this, and the record shows that John took all kinds of actions but was successful. They don't explain what his motive is. If John Peck had been closed, what motive would he have to go out and be there? How is he going to get any money? I mean, to say that John Peck didn't go, maybe he was, well, okay, this is a complicated scenario, however, but if it doesn't close, it still stays in Peck Land Company and he owns 45 percent of that, right? So he continues to have the property and he gets his mortgage paid off by the other sales. Still subject to both lawsuits. It's still subject to both. The judge acts like Vanessa Keck is losing out. Vanessa Keck still has her lawsuit. She still has her lawsuit, her claim for the $975,000. That's why, that's the beauty of the thing. And now let's talk about this reformation of contract and then I'll be fine. When this was done, and I'll agree to it, it was the spring of the year. We have 2,100 acres of farmland. We're just coming off of the best farming year ever. Farmers got money in their pocket. Running out of my back pocket, all right? So we're going to have a sale. And the sale is all predicated on settling all these things. The settlement agreement comes in predicated on a sale. Not a half a sale, as the judge says. Now, you ratchet forward to today and you say, well, he has to settle. Prices are 20 percent less on crops. We didn't knock up one acre of farmland. Farmers are not spending a stinking dime. So if a court reforms it and says we're going to have two sales, it's not at the same time. The court then has substantial terms that were not there that would affect the value of it. So in essence, what the court is trying to do, what we're all trying to do is play on the heartstrings that this is equity. You know, you're going to somehow get a windfall. There is no windfall. There is no windfall because all of the property is still impressed with all of Vanessa's claims, all of Fred's claims, and all of the mortgages except for the land that was sold. I just have a problem with how ordering another sale is not reformation. Ordering another sale is enforcement. It's not reformation. We can't go and take away all of the property that was sold to the other bidders successfully because one did not. And I just am having a problem. So help me. Well, Your Honor, that's the reason for the paragraph 12. They thought through that. You know, everybody talks about it. They thought through it. We can't find a way to do that. You cite Pritchett, too. Pritchett says that every feasible contingency that might arise in the future need not be provided for in a contract for the agreement to be enforceable. You actually cited that. Yes, that's correct. That's correct. So it's enforceable without that contract, without the provision. It's enforceable as written. What I'm saying to Your Honors is if you carefully read the record, you had no facts before you that you can reform a contract on, that you can say that it's, you know, if you find it's ambiguous, there's nothing there for you to reform it on because there's no facts. And if you want to say that, you know, this provision has been left out, there's no facts to guide you as to what the part is in here. Fairly, there's no obligation to make him pay. But why would it be prohibited to conduct a sale? That's my biggest problem. Your Honors, for the reasons that I said before, when this agreement was reached, there was a certain set of circumstances. It's contract reformation. That's what you're saying. There's a difference between 4,100-acre sale and 1,100-acre sale. The best property has been sold. The rest of this is sworn. So there's a tremendous difference. They're not going to get the benefit of the bargain if you say you've got to sell it again. Thank you. Good times out. Thank you, Mr. Osmond. Thank you both for your briefs and arguments in this interesting case. We'll take this matter under advisement and issue a decision in due course. We'll take a brief recess.